For the remaining two, the lighting system should be familiar to everyone. The key to me and to the panel is when that red line comes off, comes on, you have the rest of a sentence, not a sentence with a lot of semicolons and commas and the way William Faulkner would write a sentence, but draw your thought to a conclusion and if you need more time you can ask for it. First case is U.S. v. Sealed Juvenile. Ms. Gibbons. I'm Christy Gibbons and I represent the juvenile in this matter, the sealed matter. The juvenile is currently 16 years old. At the time of the district court proceedings and the offense at issue, he was 15 years old. So he was 15 when he committed the offense of sexual contact, abusive sexual contact of a four-year-old. Ms. Gibbons, let me ask you to walk through the operation of the sentence just a bit for me because your argument depends, makes a lot about his interaction with other people and I don't quite understand under the sentence when he will be interacting with other people. The initial 18 months was in what's called a Garza Treatment Center. Is that essentially incarceration? Has he been in that facility and not free to roam around other than within the facility? Correct, Your Honor. He's in a secured facility. The Garza facility is a secured juvenile detention facility and that's where he has been and will be for these. So most of what you're saying would not apply to what's going on at Garza Treatment Center. Correct, Your Honor. He's in a secured facility in his own supervision once he goes to New Mexico or to some other location if New Mexico is not the one that's chosen. Correct, Your Honor. It's once he's released from the secured facility in his own supervision. All right, and at that time, to the extent your complaints have to do with being around children that are younger than him, won't he? I mean, he's 16 and he's doing 18 months? He's 16. He's currently due to be released to the New Mexico facility in July, so he'll still be 16 years old. He'll be 16. And when he is released to this facility, the particular facility, will he be at a school there, a regulated type school for him, or will he be going to just a regular school with other children that aren't part of the part of this institutional scheme? From my understanding, first of all, it's not that he will be going. The BOP and the probation officer have to figure that out once the time comes, but at that point, he will be, it's more of a treatment center, and although it's unsecured, from my understanding, it is, he remains with the same children. So he won't be going to a regular public school? No, sir. And so you're not really complaining about people at that school that might be under 16, if there's any. What, who are the other people that you want him to be able to see? He's still going to be in this regulated environment, controlled environment for a while. Who are the people that he's not going to see that are going to keep him from having some kind of normal development? Your Honor, it's undetermined how long he will be in this non-secure facility. He may even go for just a brief couple of weeks where they look at him and say, you know, he's ready to go. We can't, we can't offer him any more than he already has had in this secure facility. So he may still be 16 when he's released. We don't know. It's, it's unsure. So my concerns are that whether it's when he's 16, 17, 18, these are still critical times, and he has young siblings who . . . Aren't we having to kind of guess what's going to happen to him? I mean, should we try to fashion something at this point without really knowing where he's going to be, as opposed to perhaps allowing him to petition the court and the probation officer to make some modifications if he winds up in, you know, his, his future is undetermined as well as his family's. And he would have to come out and then start a process of trying to go back home, of trying to be able to go to school, to have employment. And as of right now, the judge has just made, the district court has just made a blanket, you know, prohibition rather than have, as Your Honor is suggesting, some type of, you know, let's go and modify it or modify the, the age that he can be around depending on the circumstances. But you're, you're wanting us to solve a problem that may not occur, and we just don't know what's going to happen. We don't know what's going to happen, but there's a problem now based on the, the record that he, his, his, there's a deprivation of his liberty. He's, he's, the odds are he's going to get out. I mean, the . . . Well, let me ask you, the briefing certainly pointed out the uncertainty of it. He would be at a facility like the one in New Mexico no longer than up to age 21. As you're indicating, could be a lot less than that. What are you basing your, your statements are on, on that, the suggestion you're giving to us now, which strengthens your case certainly, that he could well not be at a facility like the one in New Mexico for any length of time at all. What, what are you basing that on? That, that, my, I'm basing that on my research of these facilities prior to this sentencing, where from my understanding, funding comes into play with who's going to pay for its, its private facilities and funding, and that's why we weren't able to get this child's mental health treatment. It was a funding issue, and so . . . What is going on now? Is he getting some sort of treatment at the Garza facility? It's called a treatment center. Yes, he is. He's, he's, he's in counseling, and he's medicated right now for his bipolar. Bipolar? Yes, Your Honor. You said there's a blanket prohibition. Most of these prohibitions are cushioned by the fact that the probation officer can authorize certain contact or certain employment or internet usage. Is your main concern this, this school issue? Well, actually, the, the minors, the safety valve of being able to go to your probation officer does not correct the overreach of these conditions, is my concern. So, for instance, with the, the, the minors, since that's the topic we're on, with him not being able to return home because he has siblings, he is not going to be . . . Yeah, but he, he, he worried about his siblings, but one of his siblings was put in danger by him. I mean, you want him to be close to his family, but he's abusive of his, of his younger family member. I mean, you, it seems to me you're looking at one side of the picture, his development, but the district judge is also, has to be concerned with the person, God bless him, he's got this terrible problem, and he's got a terrible history. He's, he's concerned with what might happen to other children. Yes, Your Honor, that concern can be allayed by modifications of this really broad supervision condition of absolutely no contact without permission of the probation officer. If the, if the district judge would have given some type of other lessened burden, such as adult supervision, or, or perhaps a short, a different time frame for, for these, for, for the age of these other, his siblings or other children, that would have alleviated the, the vast, you can't be around kids under the age of 16 without the permission of your probation officer, because it, I, I am concerned with his development, and that's because the Federal Juvenile Delinquency Act, the, one of the main purposes is rehabilitation and removing the stigma of a criminal prosecution away from a juvenile. We treat juveniles differently. As the Supreme Court said, we treat them differently because they are constitutionally different when it comes to sentencing. Let me ask you on sentencing, Judge Minaldi did not check the block that said one of the conditions of this is to register under SORNA. There was some discussion of that in the brief. Because he's a juvenile, is he not considered under the SORNA definition to be, I forget what the actual operative term is, but does he not automatically have an obligation to register under SORNA? Not for this, not for abusive sexual contact. He didn't, he didn't plead guilty to, although he may have been charged, he didn't plead guilty to a particular offense that would fit within a SORNA where he would have to register. So as the Supreme Court has said in those recent Supreme Court decisions dealing with general criminal law, the juvenile is constitutionally different because he has a greater capacity for change in rehabilitation. But isn't it the same standard whether, for any supervised release conditions, whether they're reasonable and we look at it under an SORNA? Here, he did commit an extremely serious, terrible offense with a very young child victim on the other side. I mean, I know those sentencing cases, cruel and unusual punishment cases you're talking about, but don't you acknowledge it's the same standard we apply? It is the same standard, but under that standard, the uniqueness of a juvenile in his situation has to be considered. That's what the right time is. But do we treat them all the same? I mean, I ran a juvenile program. There's a difference with a child that has something that is like he's bipolar, as opposed to some child that acts out once, has never gotten in trouble before. Maybe mom got a divorce or something like that, and he's mad at his dad, and he acts out and strikes somebody. This child is bipolar, has been involved with activities that we find reprehensible in society with young, very young children, and with a type of disease that makes him less likely, with a type of incitement that he has, and makes him more of a danger than that, you know, a person that doesn't, isn't this, we can't put everybody in the same, in the same blue suit. We necessarily, in sentencing and setting supervised release conditions, treat people differently, but this juvenile's mental health issues make him more of a person who is capable of change. He's now medicated, and we certainly can't punish him further because he's mentally ill. So this, so this is, we are treating him differently under these factors. But you don't know whether he's going to take his medication or not, whether, I mean, that's why he's going to be there for 18 months, and hopefully they'll train him or whatever. Let me ask you, a lot of these provisions has to do with places for, for him not to loiter where children, younger children are. That doesn't really prohibit him from, by chance, being at a place, but it prohibits him from like loitering there. Is there any savings in, in, in that type of provision as opposed to a blanket provision? Yes, Your Honor. He, he, he can't loiter, but I think the, the common understanding of that is he can't be somewhere for any extended period of time. If he's walking by a park, that would be okay, or walking by a school, that would be okay. However, if he wants to attend that school or go to a ball game, you know, he, he would . . . Right now, he could go with the permission of his probation officer. Not for that condition, Your Honor. That, that condition does not have the . . . Oh, you mean the loitering one? Loitering. Yeah, but the other, the other condition about, you know, going to schools or, you know, being in this general population type thing. He could, he, he could go if the probation officer approved it, right? For the general no contact with minors under 16? Yeah. Well, what's wrong with if he's doing well and the people that are treating him say he's doing well, and he doesn't have these type of impulses, and he's taking his medicine or whatever with having the probation officer, having him ask the probation officer to ask the court for permission to do it? Well, the problem with that is the, the amount of deprivation to this juvenile, to his liberty, it's greater than necessary, even with him having, him having the ability to go to a probation officer and request that. He is being taken out of the exact environment . . . Look at what he did and the danger of that he might do it again and what it could, the problems that it causes. It seems like you're honing in on, on, on one side. Because under the Federal Juvenile Delinquency Act, the rehabilitation of the juvenile is, is one of the main purposes. We're trying to treat him . . . Can they work on him and try to rehabilitate him and get his probation officer to try to help him and get permission? The only way he can do it is by not having his probation involved and, and, and just having the ability to do it, and if he's taken his medicine, it doesn't make any difference. It's just a risk that we take in order to rehabilitate him. It's not a risk in the sense that . . . Yes, it is. Tell those parents of that child that it's not a risk. The, the juvenile has been in treatment for 18 months and there are other conditions that would be a less deprivation of liberty and assist his rehabilitation that could be in place. Well, Ms. Gibbs, one of the things Judge Consciously, perhaps, is that it was a very serious, very serious situation, as Judge Benavides is indicating, as you understand better than any of us, because you've lived with this, and that that's, that's the cap. That's where you start. And depending on how well he's doing, later modifications to this, to the probation officer himself or otherwise, could be done. And it seems to me that's, I don't know if that's in any way violative of how juveniles need to be supervised. I don't know if it's, any of you excited to us about how to measure these juvenile supervision rules. So it's at least, seems to me, a way to start protective and work down from those, those controls if he's indeed doing well in the future. But . . . Answer my, the question with whatever commas and semicolons you want. Thank you. The judge did not afford for those kinds of possibilities except for the probation officer. She did, she did have the probation officer clause. But if maybe, perhaps if she would have said, you know, while you're still in treatment at the step-down facility, your probation officer is going to meet with everyone and come back to me, and we're going to modify these conditions if you're doing well, if you should go home, and do those kinds of things. But she didn't. She just said, no, you know, without the permission of the probation officer, you're not doing any . . . Thank you, Counsel. Thank you, Your Honor. May it please the Court. I'm Camille Del Meng. I represent the United States, who's the appellee in this case. And the issue before the Court, as many of the judges, as many of you have pointed out in your questioning so far, is how are we going to balance the juvenile's liberty interest, because he certainly has a liberty interest, with the need to protect the public. And in Miller, this Court said a really good way of doing that is to give the probation officer the discretion within limits. We don't let them decide everything, but we allow the probation officer the discretion within limits to determine at the time when all of this happens. And again, many of your questions have pointed out that . . . And the district judge said that, too. At one point, a counsel asked the judge a question about the condition, and the district judge's response was, well, you know, that's kind of far down the line. And that's true. Many of these things are kind of far down the line. The juvenile has an obligation to serve 18 months, for sure, in custody. Then there's a period of step-down. Now, we know we can't keep him past 21, but I think what the district judge was trying to do, and that's clear from her written reasons, for sure, was at least until he's 21, we're going to do whatever we can to protect the public. Because, Judge Benavides, as you pointed out, this is not a case like Tang and Salazar and Fernandez, where we have a defendant convicted of a non . . . the sex offense is remote in time, and the instant offense is not a sex offense. The instant offense here is a contact sex offense against a very small child, committed by a juvenile who, no one disagrees, has very serious emotional and mental problems. And so, Judge Southwick, as you pointed out, what we're doing, I think what the district judge wanted to do, is start with a very restrictive set of conditions. Allow leeway by giving the probation officer the discretion to lessen them if, over time, he's doing well. And, you know, this is something that this court talked about in Rodriguez. In Rodriguez, one of the conditions at issue was a restriction that prevented him from living within 100,000 feet, some distance of a school or a place where children were. And this court said, well, you know, this is doing well, and it would actually help him to live in these places. The probation officer has the authority to allow him to do that. Let me ask you . . . excuse me. One of the things Ms. Gibbons said towards the end, rather than leaving this all in the hands of the probation officer, she should have, the judge, should have invited, in some way, to come back and ask for an amendment. Isn't that option there, regardless, and certainly would have helped if the probation officer endorsed it and counsel and probation officer went to the judge and said, here's where we are and here's where we think the new conditions ought to be? Is that . . . do we know that's built into the system? That's built into the law, Judge, and I was going to mention that in a minute. I believe it's in 3583, maybe G, but there's a subsection of the law that . . . and all of the probation and supervised release provisions are specifically incorporated by reference into the Juvenile Delinquency Act scheme. So we say we treat juveniles differently, but in many senses we treat them the same because they're subject to the same statutory criteria and we have that authority. So that's built into the law. In any case, adult, juvenile, whatever, the person on supervision can always petition the court for a modification, a modification, and the district court retains discretion to terminate supervised release. So that's built into the law. That's not something that the district court had to expressly provide for. That's always something that the district court can do. If this juvenile gets out and is on medication and is doing great and no one's concerned about him, then that always remains an option. He can always go back to the district court and petition for some sort of reduction, termination, as I said, of his conditions of supervised release. Let me ask you about one of the conditions. Do you agree, because this is a foundation for the condition, my question on the condition, do you agree that he is not subject to SORNA? I've argued in my footnote, I think it's footnote 9 in my brief, and I will tell you I looked to see if there's any case from any circuit addressing this particular issue, and I can't find one. And I think what it's going to come to, and so I mentioned in my brief. What issue do you mean? Well, SORNA requires juveniles convicted of certain offenses, as Judge Benavides pointed out, to register. And two circuit courts, at least, have held that the SORNA registration provision trumps the confidentiality provision of the Juvenile Offender Act. The question is going to be, because the SORNA statute defines which juveniles have to register, and it talks about those who are convicted of, and I forget the exact language, I think what's going to be unclear is whether you're going to use a categorical approach, because this juvenile was originally charged with the 2241 offense. He was allowed to plead guilty to a 2242 offense, but his conduct would have satisfied... Why should we take a juvenile case to make an exception to the categorical approach and how the courts look at what a conviction is? And if we go and look at the individual conduct as opposed to an element approach, we're creating a brand new scheme because he's a juvenile. Yes and no, Judge. I'll tell you that this is not involving a juvenile. It's Gonzales Medina. I'll provide the court with the citation in a 28J letter. But Gonzales Medina addressed an exception under SORNA where there's a four-year differential between the age of the offender and the age of the person with whom the offender engaged in the sexual act. And the question was, do we use a categorical approach or do we look at conduct specific? And in Gonzales Medina, this court deviated from categorical approach and went with conduct specific for a few reasons, one of which was plain language of the statute, two of which were plain language of the statute, and the third was that the, you know... I can't listen that fast. Now what, what, what, what's the basis of that? Did they say that this was a SORNA conviction, that this wasn't a type of conviction? In Gonzales Medina? Yeah. And why did they say it fit one of these conditions? I mean, one of these offenses? Again, it had to do with the four-year differential. And I believe that the defendant, because there's an exception in SORNA to registration, if there is less than a four-year differential in age between the offender and the person with whom he engaged in a sexual act. And my recollection of the case, it's, again, it's not directly on point. It doesn't involve a juvenile or a juvenile registration. We don't have a differential problem. No. Here we have a question, seems like to me, is this an offense that you have to register under SORNA? And if he's a juvenile, it doesn't make any difference. It's either that type of an offense or it's not that type of an offense. But again, Judge, how do we figure out whether it's, quote, that type of offense? Is it the offense of conviction or is it the conduct he committed? Because the conduct he committed would violate 2241, even though he was allowed to plead guilty to a lesser offense. Oh, I know, but when you look at SORNA and it says what you have to register for, does it say, does it say offenses for which you were charged or does it say offenses for which you were convicted? It doesn't say either. It uses some language in between, which was the problem that this Court struggled with in Gonzales-Medina. And again, looked at the plain language of the statute on a completely different exception. I don't mean to suggest to you it's on all fours, but I will say the policy that, you know, the last of the three reasons that the Court looked at in Gonzales-Medina was that SORNA, as a matter of congressional intent, was intended to be a broad statute. We want a lot of people to have to register under SORNA, so we're going to resolve close calls in favor of registration. This is not like the Armed Career Criminal Act cases, where we're going to construe punishment statutes that result in significantly more severe punishment narrowly. This is a registration requirement. Well, your whole SORNA argument, you invoked that to authorize the search and seizure restriction on computers. Even without getting to SORNA, can we just look at that generally as whether it was reasonable to impose a condition allowing for the seizure and search of the computer? Absolutely. My SORNA registration argument is really only in support of the statutory provision that says if you have to register, then you're also going to be subject to random searches. But as Judge Costa says, you can, you don't even have to go there in this case. And I would suggest to Judge Benavides, that's really good. You don't have to, your argument is, you don't have to be someone that has to register in SORNA to have this to be a reasonable condition if the offense that he had, or did, related to the use of the Internet and sexual conduct and those kind of things. Absolutely. SORNA is not to touch stone. No. That was an additional argument sort of on the side. Again, I think I dropped it. But going to the offense conduct, I mean, you said earlier that his offense obviously directly implicated contact with minors. So, you know, it's clear why the district court thought those restrictions were necessary. The computer connection is much more attenuated because the offense itself did not involve the Internet at all. So what's the justification for these rather onious computer restrictions? The PSR reflects that in quote, the year leading up to the offensive conviction. And remember that the PSR is written in March of 2014. The offensive conviction occurs in November of 2013. So we're probably talking about maybe six months prior to the offensive conviction. That the juvenile's oppositional defiant disorder had gone from manifesting itself in anger to manifesting itself in inappropriate sexual behavior. He, you know, asked his, he did some inappropriate act with his sister or he wanted to do an inappropriate act with his sister and aggressively held her down. And then the PSR notes that he began accessing sexual material on the Internet. Now, it doesn't say what kind of sexual material. And remember, we have a juvenile here. So there's a whole category of sexual material that an adult could legally access that a juvenile probably can't legally access. What we call, you know, quote, adult pornography. So the PSR doesn't go into a lot of detail. But it does say, and there was no, no dispute about this in the district court. None of this was ever challenged. That in this lead up to the offensive conviction, which is a very serious offense, the juvenile began accessing sexually oriented material on the Internet. And so there, there is some connection here between all of this sexually inappropriate behavior the juvenile was engaging in that ultimately culminates in a contact sex offense against a child. And I think some people would call that escalation that, you know, maybe starts with, we hear this a lot with, with adult sex offenders. You know, they, they start with the Internet and then eventually they escalate to a contact sex offense against a child. And I would suggest for that reason that the, the record would support the imposition of some sort of computer restriction. And once you get to a, a restriction on the computer, which again, I point out on my brief, it's not absolute for two reasons. The juvenile can use a computer as long as it's not connected to the Internet. We know under, under, you know, the various decisions of this court, Ellis, I think Ellis. Why can't that be modified to. Yes. Why can't that be modified to let him use the computer, let it be on the Internet, but not let, not let him access these sites, these particular sexual type sites and allow, and, and allow monitoring. So you have, I mean, we're in our world today, I don't, just don't know how if this kid's going to have a chance to, to not develop some Internet skills and, and computer skills. Well, that's built in. You take him out of the Internet and you, you take half, half the library of the world away from him. Well, and of course that's built into that restriction. That is not an absolute restriction. The, the probation officer can grant exceptions to that. If, for example, he needs to use the Internet for schoolwork, that's built in. But he's still going to run to the probation officer every time he wants to do a Yahoo search? This is crazy. Let me ask you about the actual condition. According to Provision 13, I think, the juvenile shall now possess a computer with access to online computer services without the written approval of the probation officer. The defendant must allow the probation officer to install appropriate software to monitor, and I don't know if that would also include, I thought somewhere in here it was about blocking. So it seems to me that, that the judge put into that series of provisions the, the right for sort of an agreement to be, we each, we're going to have this software on there, you're not going to be accessing these sites, but it does take the probation officer to agree to do that. Yes, Judge. I, I think that's exactly right. I think that the, the way the conditions are crafted allow, I, I don't think the defendant would have to go to the district court or even to the probation officer. Every time he wants to use a computer on a, for a discreet purpose. I want to use it today or next Thursday. I think that the, the way the conditions are crafted allows the probation officer to grant him exceptions, and then also allows the probation officer the option to use blocking or monitoring software. So maybe the, the compromise is to say, you can use the computer, you can't access sexually explicit sites, and we're going to check it by installing this blocking and filtering software. And all of that. Is, is that something that is permissible the way it's written, or is that something that we can interpret it, interpret it as, as something that's permissible? In other words, can this court say, we, we interpret it in this way so that, or modify it in some way so we can have some kind of a reasonable accommodation? Do you mean, can, can this court direct the modification, or can this court interpret the existing modification to permit it? The latter. Okay. Absolutely. I think that this court has done it time and time again. Starting in Paul, decided 13 years ago, where the, where the restriction said no direct or indirect contact with minors. And the court says, you know, this court has the authority to interpret that in a common sense way that's not going to prohibit incidental contacts with children. You know, the court did that in Ellis, where there was a fairly broad computer restriction. And the defendant argued, well, you know, gee, my television set has computer chips in it. And, you know, this runs my microwave oven, has a computer panel. And the court says no. This court has the authority to interpret restrictions and, and thus uphold them. Well, speaking of that authority to interpret the restrictions, I know the district court made a comment that the defendant shouldn't attend a general population school. But looking at the actual conditions, do you see the conditions as restricting him from attending a high school? Because the condition says the juvenile must not loiter within 100 feet of schoolyards, parks, etc., or other places primarily used by children under the age of 16. I think Judge Benavidez pointed out earlier, loiter sort of indicates being somewhere where you're not supposed to be and not doing anything. So I'm not sure that would encompass actually attending classes. And then you also have this issue primarily used by children 15 and under, which I don't think a high school would be primarily used by kids that young. So what's the government's position on whether this restriction allows him to attend a school, a high school? Our position is that the loiter restriction would not address his ability to attend. Again, what is the common sense? Exactly. Contact restriction. Exactly. The common sense definition of loiter is to hang around someplace with no good reason for being there. The restriction that would prevent his attendance from school would be the no contact. And that one permits exceptions. The loitering, I think it would be very unusual to ask your probation officer for permission to loiter. That's one of these things that you just probably shouldn't be doing it in the first place. Again, the common sense definition. So that's the government's position, that it's the no contact, which permits exception. The loitering, which does not, would not address schools because people don't historically loiter. You're going to do more at school than just loiter. So with probation approval, he could attend a general population school. Absolutely. Absolutely. The members of the panel have no more questions. Thank you. All right, counsel. Thank you. Very briefly, your honors, I would like to comment and clarify the Internet computer restriction. There are two very distinct things here. There is already in place a restriction on this juvenile accessing, viewing, or possessing sexually explicit material, and that is not challenged. The juvenile has not challenged that provision. That condition, he cannot access sexually explicit material. That's the underlying concern in the government's entire argument concerning the computer. And when the discussion about fashioning, how you would fashion this ruling to accomplish the purpose of preventing him from viewing this sexually explicit material, is already in place in the judgment. The judgment already has that. He can't look at it, and they can go in and search his computer. And he hasn't challenged it. What he challenges is this broad Internet ban, even with permission. I thought you were challenging the search part. We're challenging the fact that he can't use the Internet without permission of the probation officer. And related to that is they can come in and search his, they can put monitoring equipment. So you are challenging the monitoring and the searching. As written, the monitoring provision is for all of his Internet use to ensure he's not using the Internet.  So all of the government's fears have been allayed by the judgment as it's written. But probation could authorize him as written to use the Internet, and the monitoring software would be used to make sure, okay, he's using it, but he's not accessing these prohibited sites, right? That would be an option, except that as written, Judge Benavidez is correct. He has to get specific written permission for every use of the computer. And if the, we don't know. Will the probation officer just say he can access it? That's a fairly common restriction in cases often where there's no evidence like there is here that someone's actually ever come into bodily harm with somebody. The restrictions on Internet, the ban on Internet use relate to the underlying crime having involved the Internet, like possession of child pornography, aggravated identity theft, people who are emailing minors and getting them to send nude photos. There's a connection. Well, even in Fernandez, after we talked about the connection, we didn't say, but this does not prohibit the judge from making any reasonable limitation under the terms of supervision. So I think even your best case, in a way, recognized that a judge, looking at the overall picture and not just the crime of conviction, can decide on what needs to be done. Except the Fernandez case is actually a lot more limited than the condition before the court that is challenged by this juvenile. The juvenile challenges the ban on Internet use. Fernandez challenged the monitoring software that was placed on his computer to make sure he wasn't viewing sexually explicit material. That's not what's in front of the court here. He can't look at sexually explicit material. What's in front of the court is can he access half the world's library on a day-to-day basis? Will he have to go to the and get written permission from a probation officer when his underlying crime did not involve the use of the Internet and this one passing comment that he viewed sexually explicit material on the Internet. The concern is the sexually explicit material, not the use of the Internet. So it's a critical distinction between these two lines of cases that it's imperative that this… Saying don't look at this stuff on the Internet is completely unenforceable unless you have monitoring and search provisions. And if this court and this court's discretion decided that should be part of the conditions, that would be appropriate. Vacate and include that specific additional condition. All right, Counsel. Thank you. Thank you, Your Honor. Thank you both for illuminating the issues in this case for us. Thank you both for your good arguments.